UNITED STATES DISTRICT COURT
NONTHERN DISTRICT OF OHIO
------------------------------------------------------

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:07-CR-17 |
| Plaintiff, | : | JUDGE JAMES S. GWIN |
| vs. | : | OPINION AND ORDER |
| | : | [Resolving Doc. 14] |
| JESSE TATE, | : | |
| Defendant. | : | |

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On January 4, 2007, the Grand Jury indicted Defendant Jesse Tate on one charge of knowingly and intentionally possessing with the intent to distribute 45.35 grams of cocaine base ("crack") in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). [Doc. 8.] On February 9, 2007, Defendant filed a Motion to Suppress Statements and Illegally Seized Property. [Doc. 14.] On February 14, 2007, Plaintiff United States of America opposed the motion. [Doc. 17.] On February 15, 2007, this Court held a hearing regarding Defendant's Motion to Suppress. For the following reasons, the Court hereby **GRANTS** Defendant's Motion to Suppress Statements and Illegally Seized Property.

**I. Background**

At approximately 10:00 p.m. on November 30, 2006, Detectives Todd Clark and John Dlugonliski of the Cleveland Police Narcotics Department observed Willard McConnell engage in a narcotics transaction with Anthony Greer and a Drug Enforcement Administration ("DEA")

Case No. 1:07-CR-17
Gwin, J.

Source of Information ("SOI").  The government alleges that the SOI was previously outfitted with a radio transmitter and pre-recorded buy money as part of a "buy and bust" operation.  Clark and Dlugonliski witnessed the SOI pick up Greer at a gas station.  The SOI and Greer then traveled to an apartment building, located at 10722 Lee Avenue, Cleveland, Ohio.  McConnell met Greer and the SOI outside the apartment building.  McConnell then entered the apartment building while Greer and the SOI waited in the SOI's vehicle.  The government alleges that after a brief period of time, McConnell reemerged from the apartment complex and completed the sale of the cocaine base.  At this time, DEA agents arrested both Greer and McConnell.

Clark and Dlugonliski then questioned McConnell, attempting to ascertain where he had traveled within the apartment complex.  McConnell allegedly stated that he was at his girlfriend's apartment, which was Apartment 5.  Clark and Dlugonliski then entered the apartment complex, knocked on the door of Apartment 5, and spoke with a female who answered the door.  The occupant of Apartment 5 asserted McConnell had not been in her apartment.  The detectives also claim the occupant stated McConnell might have been in the apartment down the hall, Apartment 1. Apparently taking the occupant of Apartment 5 at her word, the detectives left and began walking toward Apartment 1.  The detectives had no information suggesting that the occupant in Apartment 5 was reliable.

At this time, the detectives encountered another female walking down the stairs of the apartment complex who claimed to be the landlady.  She came to the first floor to learn why police cars were outside the building.  After some discussion in which the detectives described McConnell, the landlady informed the detectives that McConnell was generally "in and out of Apartment 1."

The detectives advised the landlady that they intended to make entry into Apartment 1.  The

-2-

Case No. 1:07-CR-17
Gwin, J.

landlady requested that she be permitted to call the lessee to have him come out of his apartment so the detectives would not damage the door. The detectives acquiesced, but informed the landlady not to mention that police were outside. However, when the landlady called the lessee, she told him that police were outside, the building was surrounded and that he needed him to come out of his apartment. The detectives immediately broke down the door to Apartment 1 and entered with weapons drawn.

Clark and Dlugonliski instantly encountered Defendant Jesse Tate, who was sitting in a chair in the front living room. The living room also contained a fold-out bed. A 12-year-old child, later identified as the lessee's son, was seated on the bed. Additional detectives then entered the apartment and proceeded to secure the premises by searching all rooms for additional inhabitants. Approximately six to eight detectives entered the apartment in total. As the detectives forcibly entered the apartment, the apartment lessee, originally identified as Wallace Jackson, emerged from the bathroom wearing a towel and carrying a phone. Police directed Jackson to a back bedroom at gunpoint. Defendant Tate and the lessee's son were also held at gunpoint and told not to move until the apartment was secure. After a few minutes, the police determined that there were no other occupants of the apartment and holstered their weapons.

Clark and Dlugonliski testified that while Jackson was permitted to dress himself, detectives informed him that they had entered his apartment because they believed McConnell had obtained narcotics from within the location. Jackson denied any knowledge of narcotics in his apartment. The detectives then requested to search Jackson's apartment. The detectives allege that Jackson voluntarily consented to the search. Within approximately ten to fifteen minutes, Jackson had signed a consent to search form. The detectives also claim that Jackson was informed prior to giving

Case No. 1:07-CR-17
Gwin, J.

his consent that he was not required to consent to the search of his apartment. Finally, Clark and Dlugonliski claim Jackson agreed to show the detectives where McConnell lived. Additional officers then brought Jackson to McConnell's house under Jackson's guidance.

Clark and Dlugonliski testified that upon receiving the consent to search form, they searched the entirety of Jackson's apartment. During this search, Jesse Tate remained seated in the chair in the living room. Detective Dlugonliski testified that Defendant Tate was not initially searched for weapons until five or ten minutes after the detectives entered the apartment. Once the consent to search form was signed by Jackson, Dlugonliski moved Tate to the fold-out bed next to the lessee's son. Dlugonliski then searched the chair that Tate had been sitting on for narcotics or other contraband.

Dlugonliski next searched the area immediately surrounding Tate's chair, including Tate's boots. Tate was not wearing shoes at the time of the search. The pair of boots was located directly adjacent to Tate's feet at the foot of the chair. Dlugonliski testified that he believed the boots belonged to Defendant Tate because "They were off, unlaced and they were seated at his seat." Dlugonliski then testified that he picked up the boot, shook the boot, and heard a noise from inside the boot. He then turned the boot over and a bag containing cocaine base fell from the boot.

At this point in time, the detectives placed Defendant Tate under arrest. Detective Clark then advised Tate of his *Miranda* rights from memory. Defendant Tate admitted that the crack in the boot belonged to him and that the lessee nor his son possessed the cocaine base.

In contrast to the detectives' testimony, tenant Wallace Jackson testified that he was taken to McConnell's house prior to signing a consent to search form. Jackson described that he was handcuffed to the front of the car while the police drove him to McConnell's house. Jackson also

-4-

Case No. 1:07-CR-17
Gwin, J.

testified that Defendant Tate was handcuffed in a chair in the living room at the time Jackson left for McConnell's house. After Jackson explained which house was McConnell's, police then brought Jackson back to his own apartment.

Jackson testified that upon returning to his apartment complex he was told that it would be in his best interest to cooperate with the police because he could be taken to jail and his son could be taken away from him. Jackson testified that he then signed the consent to search form prior to re-entering his apartment, and while handcuffed. No time of signature is listed on the form. Jackson further testified that immediately upon re-entering his apartment he witnessed a detective pick up a bag of crack off the television. That detective then said, "[l]ook what we found," to another detective.

## II. Legal Standard

"'[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.'" *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (citation omitted). A subjective expectation of privacy is legitimate if society deems the expectation reasonable. *See id.* at 95-96. The Supreme Court has determined that an individual's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *See id.* at 96-97. *See also United States v. Pollard*, 215 F.3d 647-48 (6th Cir. 2000) (visitor who occasionally spent the night, kept some personal belongings at the residence and sometimes ate meals with the family during visits had a legitimate expectation of privacy).

"[I]n 'the ordinary case,' seizures of personal property are 'unreasonable within the meaning of the Fourth Amendment,' without more, 'unless . . . accomplished pursuant to a judicial warrant,'

Case No. 1:07-CR-17
Gwin, J.

issued by a neutral magistrate after finding probable cause." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (citing *United States v. Place*, 462 U.S. 696, 701 (1983)). However, exigent circumstances may exist that would justify a warrantless search if the following conditions are met: (1) the police have probable cause to believe the location to be searched contained contraband; (2) the police had "good reason to fear that, unless restrained" the contraband would be destroyed before the police could return with a warrant; (3) "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy;" and (4) "the police imposed the restraint for a limited period of time." *McArthur*, 531 U.S. at 331-33.

Additionally, "[e]xigent circumstances may not consist of the likely consequences of the government's own actions or inactions. In determining whether officers create an exigency, [courts examine] the 'reasonableness of the officers' investigative tactics leading up to the warrantless entry.'" *United States v. Gomez-Moreno*, 2007 U.S. App. LEXIS 3251, *9-10 (5th Cir. 2007). "[F]or a warrantless search to stand, law enforcement officers must be responding to an unanticipated exigency rather than simply creating the exigency for themselves." *United States v. Chambers*, 395 F.3d 563, 566 (6th Cir. 2005).

"The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, . . . but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted). The exclusionary rule extends to the point at which the connection between the illegal search and seizure and the derivative evidence "may have become so attenuated

Case No. 1:07-CR-17
Gwin, J.

as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939). *See also United States v. Vasquez*, 638 F.2d 507, 527 (2d. Cir. 1980) ("suppression is required of any items seized during the search of the house, unless the taint of the initial entry had been dissipated before the 'consents' to search were given").

Generally, "if consent is given after an illegal seizure, that prior illegality taints the consent to search." *United States v. Richardson*, 949 F.2d 851, 858 (6th Cir. 1991). Nevertheless, "[i]f consent to search is given at a time that is sufficiently attenuated from an illegal arrest, the taint may be considered to have been dissipated, and evidence discovered during the search will not be suppressed." *Id.* However, "the 'primary taint of the unlawful invasion' may only be purged when the suspect's subsequent consent is 'the product of an intervening act of free will.'" *United States v. Grant*, 920 F.2d 376, 388 (6th Cir. 1990) (quoting *Wong Sun*, 371 U.S. at 486).

The government maintains the burden of proving the voluntariness of the consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. "The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct" are all factors to be considered in determining whether the consent is sufficiently removed from the taint of the illegal arrest. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

"Absent special circumstances, the police of course have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion." *Rivera v. United States*, 928 F.2d 592, 606 (2d. Cir. 1991) (citing *Michigan v. Summers*, 452 U.S.

-7-

Case No. 1:07-CR-17
Gwin, J.

692 (1981)).  The police also have the authority to make a limited search of an individual on the premises to the extent necessary to insure they do not pose a hazard.  *United States v. Barlin*, 686 F.2d 81, 87 (2d Cir. 1982).  "Beyond this general authority to detain persons and make limited security searches, however, there must be probable cause, or at least some degree of particularized suspicion, to justify further searches or seizures of individuals."  *Rivera*, 928 F.2d at 606 (citing *Ybarra v. Illinois*, 444 U.S. 85, 91-94 (1979)).

Finally, "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."  *Harris v. United States*, 390 U.S. 234, 236 (1968).

### III.  Analysis

Defendant Tate's Motion to Suppress has merit for two independent and sufficient reasons: (1) Jackson's consent to search was not an intervening act of free will sufficiently removed from the detectives' illegal search so as to purge the taint of their unlawful activity; and (2) the search of the boot did not fall within (a) the parameters of Jackson's consent to search; (b) a limited, self-protective frisk; or (c) the plain view of an officer.  For these independent and sufficient reasons, the crack and confession must be suppressed.

*A.  Standing*

The government argues that Defendant Tate was merely a transitory house guest with no legitimate expectation of privacy.  As such, the government argues that Tate lacks standing to challenge the constitutionality of the search that revealed crack in his boot.  The Court disagrees.

Both Jackson and Tate testified that the defendant had been staying overnight at the apartment approximately three to four nights per week since the summer.  The presence of an

Case No. 1:07-CR-17
Gwin, J.

additional fold-out bed in the living room supports this notion. Likewise, both Jackson and Tate testified that the defendant ate meals at the apartment, kept toiletries at the apartment, and occasionally received mail at the apartment. Additionally, both Jackson and Tate testified that the defendant kept a significant amount of clothing at the apartment, as well as numerous pairs of shoes. Jackson testified that although Tate did not pay rent, he helped out by purchasing groceries on a regular basis.

The Court credits the testimony of both Jackson and Tate as it relates to the defendant's regular overnight presence in the apartment. Defendant Tate was not merely a transitory house guest, a first time visitor or a guest in the apartment for a business purpose. Rather, as a regular overnight guest who kept a significant amount of personal possessions at the apartment, the defendant maintained a reasonable expectation of privacy sufficient to warrant standing to challenge the search.

*B. Exigent Circumstances*

The presence of exigent circumstances that would justify a warrantless search requires that (1) the police have probable cause to believe the location to be searched contained contraband; (2) the police had "good reason to fear that, unless restrained" the contraband would be destroyed before the police could return with a warrant; (3) "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy;" and (4) "the police imposed the restraint for a limited period of time." *McArthur*, 531 U.S. at 331-32.

In the instant case, the police did not have probable cause to believe Apartment 1 contained contraband. The apartment complex entered by McConnell prior to the narcotics transaction was a multi-story building that housed a significant number of units. Police had no indication from

Case No. 1:07-CR-17
Gwin, J.

personal observation which of those units McConnell had earlier entered. Although detectives testified that McConnell was only in the apartment building for a short period of time, numerous units would have been accessible within that period.

McConnell initially told detectives that he had entered his girlfriend's apartment, Apartment 5. Detectives knocked on the door of Apartment 5 and spoke with the female who answered. At no point in time did the police forcibly enter Apartment 5 or even request access to the apartment. Instead, without any provided justification, the police readily accepted the woman's denial of McConnell's prior presence. In addition, the police immediately left for Apartment 1 at her suggestion that McConnell might have entered that unit.

The police had no indication of the reliability of the occupant of Apartment 5. In fact, if McConnell had entered Apartment 5 and illegal activity was afoot, it would have been self-serving for the occupant to deny McConnell's presence and provide the police with misleading information to avert their suspicion. Given that the occupant had at the very least encountered McConnell before, McConnell's prior statement that he had entered Apartment 5 actually became more credible.

The detectives then encountered a woman who claimed to be the landlady while the detectives walked towards Apartment 1. She informed the detectives that McConnell was generally "in and out of Apartment 1." Once again, the police had no means of testing the reliability of this information. In any case, this assertion lent some credence to the notion that McConnell may have entered Apartment 1 at some point.

However, there was no evidence that Apartment 1 contained contraband. Even if one assumes that McConnell entered Apartment 1, there is no indication from any informant, including McConnell, that he entered the apartment to retrieve narcotics. The fact that McConnell may have

-10-

Case No. 1:07-CR-17
Gwin, J.

entered the apartment immediately prior to executing a narcotics transaction is the only evidence that narcotics would be found within. This lone fact does not establish probable cause. Furthermore, assuming (1) McConnell entered Apartment 1 (2) to retrieve drugs, it would be pure speculation to believe the apartment still contained contraband narcotics, let alone that these remaining narcotics would be immediately destroyed if the police were to knock on the door as they had with Apartment 5. Probable cause to break down the door of Apartment 1 did not exist in such circumstances.

Additionally, the police exacerbated any exigent circumstances through their own actions. "One reasonable investigative tactic is a 'knock and talk' strategy where officers seek to gain an occupant's consent to search or where officers reasonably suspect criminal activity." *Gomez-Moreno* 2007 U.S. App. LEXIS 3251 at *10. The government adopted this strategy when approaching Apartment 5. Instead of employing the same strategy, the police prepared to forcibly enter Apartment 1 at 10:00 p.m at night while equipped with insufficient additional information to necessitate such a tactical shift.

Further, neither detective testified that they informed the landlady why she should refrain from mentioning the presence of police or the potential consequences of providing such information. The circumstances created by the detectives' choice to permit the landlady to call the lessee did not increase the likelihood that narcotics would be found within the apartment and could not establish probable cause to justify a warrantless search. *See United States v. Vega*, 221 F.3d 789, 800 (5th Cir. 2000) ("The police may not now rely on these circumstances of their own making to support the proposition that the warrant requirement should be excused.").

Moreover, even if the landlady's announcement that police were present had not resulted from the detectives' botched tactical decision, the announcement itself does not establish sufficient

-11-

Case No. 1:07-CR-17
Gwin, J.

exigent circumstances to justify breaking through the door of Apartment 1 and conducting a warrantless search. Sixth Circuit precedent guides this holding.

> The fact that the woman at the door called out "police" and retreated back to another room does not create an exigent circumstance. It is her constitutional right. Such a retreat and refusal to allow soldiers or armed officers into the home is every citizen's right under the Fourth Amendment, the very reason for its creation. The exercise of this fundamental right against armed invasion of the home is certainly not, as the government seems to imply, the "equivalent" to yelling "destroy the drugs" -- or "get your guns ready" or "try to hide or destroy the boiler and all the lab equipment." The exercise of a constitutional right at the front door of your home not to consent to talk or allow a search does not create an exigency justifying a warrantless entry.

*United States v. Chambers*, 395 F.3d 563, 568-69 (6th Cir. 2005).

One of the factors to be considered when evaluating the presence of exigent circumstances is whether "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy." *McArthur*, 531 U.S. at 332. Permitting the lessee to respond to the landlady's phone call or simply knocking on the door as they did with Apartment 5 would have constituted reasonable efforts by the detectives under these circumstances. Immediately breaking down the door upon hearing the landlady's announcement was unreasonable. As such, there are no exigent circumstances that justified the warrantless search of Apartment 1.

*C. Voluntariness of Consent to Search*

Generally, "if consent is given after an illegal seizure, that prior illegality taints the consent to search." *United States v. Richardson*, 949 F.2d 851, 858 (6th Cir. 1991). However, if a consent to search is given under circumstances sufficiently attenuated from the illegal actions of law enforcement, the taint may have sufficiently dissipated to justify restraint in application of the exclusionary rule. However, "the 'primary taint of the unlawful invasion' may only be purged when the suspect's subsequent consent is 'the product of an intervening act of free will.'" *Grant*, 920

Case No. 1:07-CR-17
Gwin, J.

F.2d at 388 (quoting *Wong Sun*, 371 U.S. at 486).

The Supreme Court established three factors ~~for consideration~~ when evaluating the totality of the circumstances in determining whether the consent is sufficiently removed from the taint of the illegal arrest: (1) the temporal proximity of the arrest and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04.

In the instant case, Wallace Jackson's consent was obtained within ten minutes of the forced entry. Ten minutes is hardly sufficient time for the impact of numerous detectives illegally bursting through Jackson's front door and holding the occupants of his apartment at gunpoint to subside. Any decisions made at this time would necessarily reflect the taint of the detectives' unlawful entry.

Other than detectives holstering their weapons and permitting Jackson to dress himself, there were no intervening circumstances between the unlawful entry and the consent. Notably, both detectives testified that none of the occupants were free to leave the premises and neither Tate nor the lessee's son were free to move whatsoever.

Finally, the flagrancy of the official misconduct was substantial. The detectives broke through Jackson's door between 10:00 and 10:30 p.m. The detectives had no inkling who might be in the apartment and no probable cause to search the premises. Furthermore, after permitting the landlady to call the lessee to arrange a peaceful emergence from the location, the detectives inexplicably escalated the potential for alarm and violence by responding with immediate force. The ultimate result of this conduct was a twelve-year-old child waking to a terrifying scene which included screaming law enforcement officers, the destruction of property, weapons trained on every occupant, and the boy's father being led through the apartment half-naked at gunpoint. Fortunately,

Case No. 1:07-CR-17
Gwin, J.

no one was hurt in this altercation. However, this mayhem illustrates the precise reason the founding fathers ensured protection from unreasonable searches and seizures was one of the bedrock principles of our nation.

Consideration of each of the three *Brown* factors demonstrates that Jackson's subsequent consent was not the product of an intervening act of free will. Therefore, as the taint of unlawful police activity had not sufficiently dissipated, Jackson's consent cannot be considered voluntary. Exclusion of the fruits of the search is appropriate.

*D. Parameters of the Consent to Search*

Exclusion of the cocaine base found in the defendant's boot is appropriate for another independent and sufficient reason. Obtaining consent to search a particular premises does not entitle law enforcement officials to fully search every occupant therein. Rather, police maintain a limited authority to detain and frisk individuals they encounter while executing a lawful search as a self-protective measure. "Beyond this general authority to detain persons and make limited security searches, however, there must be probable cause, or at least some degree of particularized suspicion, to justify further searches or seizures of individuals." *Rivera*, 928 F.2d at 606 (citing *Ybarra*, 444 U.S. at 91-94).

In the instant case, Detectives Clark and Dlugonliski never suggested the search of Defendant Tate's boot was part of a cautionary frisk for weapons. Instead, the detectives describe how the defendant was initially frisked for weapons approximately five to ten minutes after the police entered Apartment 1. Tate was frisked again for weapons after Jackson signed a consent to search form. Tate was then specifically moved away from the chair the boot was beneath so that the detectives could search the entirety of the living room. At no point did either detective testify

Case No. 1:07-CR-17
Gwin, J.

that they believed Tate posed a threat or that his boots needed to be searched for weapons.

In *Barlin*, the court deemed a search of the purse of an apartment occupant permissible because this minimal invasion was necessitated by the limited purpose of ensuring officer safety. Indeed, the *Barlin* court posited "a lady's handbag is the most likely place for a woman to conceal a weapon." *Barlin*, 686 F.2d at 87 (citation omitted). In the present case, there was no self-protective motivation for the search of Tate's boot when police had already occupied the apartment without incident for over twenty minutes and Defendant Tate had been specifically moved out of arms reach of the object prior to the search. Although Dlugonliski testified that he knew the boots belonged to the defendant, he proceeded to search the boots as though they were covered within the parameters of the consent to search form signed by the lessee. They were not.

In addition, the crack was not in plain view. Dlugonliski testified that he picked up the boot, shook the boot and heard a noise from inside. He then turned the boot over and a bag containing crack fell from the object.[1]

---

[1] "Q: How did you search the boots?

A: I just picked them up, went like this and a bag of crack was found.

Q: Now, you're motioning that like you picked up the boots with both hands?

A: I picked the boot up, shook it and the bag of crack fell down.

. . .

Q: Did you hear something drop or was there a noise when you shook it?

A: I immediately could tell there was something in it. It was a bag of crack. I immediately noticed it.

Q: Even before you shook it?

A: I didn't know what was in it before I shook it.

. . .

(continued...)

Case No. 1:07-CR-17
Gwin, J.

As such, the search of the boot did not fall within (1) the parameters of Jackson's consent to search; (2) a limited, self-protective frisk; or (3) the plain view of an officer. For these independent and sufficient reasons, the crack must be suppressed.

*E. Confession*

Finally, the confession that followed the detectives' discovery of crack within Defendant Tate's boot must also be suppressed as fruit of the poisonous tree. The exclusionary rule extends to the point at which the connection between the illegal search and seizure and the derivative evidence "may have become so attenuated as to dissipate the taint." *Nardone*, 308 U.S. at 341. Tate's confession directly succeeded the unlawful entry of Apartment 1 and the unreasonable search of his personal property. Other than the detective's presentation of Tate's *Miranda* rights, no time or intervening circumstances passed between the illegal activity of law enforcement and the confession provided by the defendant. Given the flagrancy of the police conduct discussed *supra* and the clear causal connection between the misconduct and Defendant's statements, Tate's confession was not sufficiently attenuated so as to dissipate the taint of the detectives' illegal activity and prevent just application of the exclusionary rule.

## IV. Conclusion

As such, the Court **GRANTS** Defendant's Motion to Suppress Statements and Illegally Seized Property for two independent and sufficient reasons: (1) Jackson's consent to search was not an intervening act of free will sufficiently removed from the detectives' illegal search so as to purge

---

$^{1/}$(...continued)
Q: And I think you testified that you picked the boot up and dumped it out and out came the crack, correct?

A: As soon as I picked it up, it went clunk, and I knew there was something in the boot. I went like that, and there was a bag of crack."

-16-

Case No. 1:07-CR-17
Gwin, J.

the taint of their unlawful activity; and (2) the search of the boot did not fall within (a) the parameters of Jackson's consent to search; (b) a limited, self-protective frisk; or (c) the plain view of an officer.

       IT IS SO ORDERED.


Dated: February 26, 2007             s/  *James S. Gwin*
                                                                              JAMES S. GWIN
                                                                               UNITED STATES DISTRICT JUDGE